# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHEUSETTS

KURT SCHLAGEL, Derivatively on Behalf
of LOGMEIN, INC.,

        Plaintiff,

v.

WILLIAM R. WAGNER, MICHAEL K.
SIMON, SARA C. ANDREWS, EDWIN J.
GILLIS, DAVID J. HENSHALL, MICHAEL
J. CHRISTENSON, STEVEN J. BENSON,
ITA BRENNAN, ROBERT M.
CALDERONI, and PETER J. SACRIPANTI,

        Defendants,

and

LOGMEIN, INC.,

        Nominal Defendant.

Case No.:

Plaintiff Kurt Schlagel ("Plaintiff"), by and through his undersigned counsel, derivatively on

behalf of Nominal Defendant LogMeIn, Inc. ("LogMeIn" or the "Company"), submit this Verified

Shareholder Derivative Complaint (the "Complaint").  Plaintiff's allegations are based upon his

personal knowledge as to himself and his own acts, and upon information and belief, developed from

the investigation and analysis by Plaintiff's counsel, including a review of publicly available

information, including filings by LogMeIn with the U.S. Securities and Exchange Commission

("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly

available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of

LogMeIn against certain of its officers and directors seeking to remedy the Director Defendants' (as defined below) breach of fiduciary duties and corporate waste that occurred from December 14, 2017 through the present (the "Relevant Period") and have caused substantial harm to LogMeIn.

## JURISDICTION

2.      Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

3.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (a) the Company maintains its principal place of business in this District; (b) one or more of the defendants either resides in or maintains executive offices in this District; (c) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (d) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### Plaintiff

5.      *Plaintiff Kurt Schlagel* is, and was at relevant times, a shareholder of LogMeIn, Inc. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

6.     ***Nominal Defendant LogMeIn*** is a Delaware corporation, located in Boston, Mass. LogMeIn provides a portfolio of cloud-based communication and collaboration, identity and access, and customer engagement and support solutions.

**Director Defendants**

7.     ***Defendant William R. Wagner*** ("Wagner") has served as the Company's President and Chief Executive Officer ("CEO") since December 2015 and has served on the Company's Board of Directors ("Board") since March 2015.  Prior to that, he served as the Company's Chief Operating Officer ("COO").

8.     ***Defendant Michael K. Simon*** ("Simon") is the Co-founder and has served as the Chairman of the Board of the Company since 2003.  Defendant Simon is a member of the Company's Operating Committee.

9.     ***Defendant Sara C. Andrews*** ("Andrews") has served as a director of the Company since April 2018.

10.     ***Defendant Edwin J. Gillis*** ("Gillis") has served as a director of the Company since November 2007.  Defendant Gillis is the Chair of the Company's Audit Committee.

11.     ***Defendant David J. Henshall*** ("Henshall") has served as a director of the Company since January 2017.  Defendant Henshall is a member of the Company's Audit Committee and is the Chair of the Compensation Committee.

12.     ***Defendant Michael J. Christenson*** ("Christenson") has served as director of the Company since August 2010.  Defendant Christenson is a member of the Company's Compensation Committee, Nominating & Corporate Governance Committee, and Operating Committee.

13.     ***Defendant Steven J. Benson*** ("Benson") served as a director of the Company since

October 2004.  Defendant Benson is a member of the Company's Compensation Committee and the Chair of the Nominating and Corporate Governance Committee.

14.     **Defendant Ita Brennan** ("Brennan") served as a director of the Company since November 5, 2018.  Defendant Brennan is a member of the Audit Committee.

15.     **Defendant Robert M. Calderoni** ("Calderoni") served as a director of the Company since January 2017.  Defendant Calderoni is a member of the Company's Compensation Committee and the Chair of the Operating Committee.

16.     **Defendant Peter J. Sacripanti** ("Sacripanti") served as a director of the Company since January 2017.  Defendant Sacripanti is a member of the Company's Audit Committee and Nominating & Corporate Governance Committee.

17.     Defendants Wagner, Simon, Andrews, Gillis, Henshall, Christenson, Benson, Brennan, Calderoni, and Sacripanti are herein referred to as the "Director Defendants".

## THE COMPANY'S CORPORATE GOVERNANCE

18.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

19.     The Company maintains a Code of Business Conduct and Ethics.  This document states in relevant part:

**Accuracy of Books and Records and Public Reports**

Employees, officers and directors must honestly and accurately report all business transactions. You are responsible for the accuracy of your records and reports. Accurate information is essential to the Company's ability to meet legal and regulatory obligations.

All Company books, records and accounts shall be maintained in accordance with all applicable regulations and standards and accurately reflect the true nature of the transactions they record. The financial statements of the Company shall conform to

generally accepted accounting rules and the Company's accounting policies. No undisclosed or unrecorded account or fund shall be established for any purpose. No false or misleading entries shall be made in the Company's books or records for any reason, and no disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation.

It is the policy of the Company to provide full, fair, accurate, timely and understandable disclosure in reports and documents filed with, or submitted to, the Securities and Exchange Commission and in other public communications.

**Concerns Regarding Accounting or Auditing Matters**

Employees with concerns regarding questionable accounting or auditing matters or complaints regarding accounting, internal accounting controls or auditing matters may confidentially, and anonymously if they wish, submit such concerns or complaints in writing to the Company's General Counsel and Chief Financial Officer. See "Reporting and Compliance Procedures." All such concerns and complaints will be forwarded to the Audit Committee of the Board of Directors, unless they are determined to be without merit by the General Counsel and Chief Financial Officer of the Company. In any event, a record of all complaints and concerns received will be provided to the Audit Committee each fiscal quarter. Any such concerns or complaints may also be communicated, confidentially and, if you desire, anonymously, directly to any member of the Audit Committee of the Board of Directors.

The Audit Committee will evaluate the merits of any concerns or complaints received by it and authorize such follow-up actions, if any, as it deems necessary or appropriate to address the substance of the concern or complaint.
The Company will not discipline, discriminate against or retaliate against any employee who reports a complaint or concern, unless it is determined that the report was made with knowledge that it was false.

20.     The Company also maintains an Audit Committee Charter.  The Audit Committee

Charter states in relevant part:

**Purpose**

The purpose of the Audit Committee of the Board of Directors (the "Board") of LogMeIn, Inc. (the "Company") is to assist the Board's oversight of the Company's accounting and financial reporting processes and the audits of the Company's financial statements.

*       *       *

**Authority and Responsibilities**

**General**

The Audit Committee shall discharge its responsibilities and shall assess the information provided by the Company's management and the Company's registered public accounting firm (the "independent auditor"), in accordance with its business judgment.  Management is responsible for the preparation, presentation, and integrity of the Company's financial statements, for the appropriateness of the accounting principles and reporting policies that are used by the Company and for establishing and maintaining adequate internal control over financial reporting.  The independent auditor is responsible for auditing the Company's financial statements and the Company's internal control over financial reporting and for reviewing the Company's unaudited interim financial statements.   The authority and responsibilities set forth in this Charter do not reflect or create any duty or obligation of the Audit Committee to plan or conduct any audit, to determine or certify that the Company's financial statements are complete, accurate, fairly presented, or in accordance with generally accepted accounting principles or applicable law, or to guarantee the independent auditor's reports.

## DUTIES OF THE DIRECTOR DEFENDANTS

21.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of LogMeIn, the Director Defendants owed LogMeIn and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage LogMeIn in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of LogMeIn and its investors.

22.     Each director of the Company owes to LogMeIn and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

23.     To discharge their duties, the officers and directors of LogMeIn were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of LogMeIn were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     Remain informed as to how LogMeIn conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     Ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

24.     Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of LogMeIn, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

25.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements as alleged herein.  As a result, LogMeIn has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

26.     On February 1, 2017, the Company issued a press release which "announced the completion of its previously disclosed merger with Citrix Systems, Inc.'s (NASDAQ: CTXS) GetGo, Inc. subsidiary, a wholly owned subsidiary consisting of Citrix's GoTo family of service offerings."

## MATERIALLY FALSE AND MISLEADING STATEMENTS

27.     On March 1, 2017, the Company filed its annual report for the fiscal year ended December 31, 2016 on Form 10-K (the "2016 10-K") with the SEC, which provided the Company's

annual financial results and position.  The 2016 10-K was signed by Defendant Wagner.  The 2016

10-K also contained a signed certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by

Defendant Wagner attesting to the accuracy of financial reporting, the disclosure of any material

changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

28.     The 2016 10-K stated that many of the Company's services are offered through

subscription contracts, stating in relevant part:

> The services offered by us are generally sold pursuant to agreements that are one
> year in duration.  Customers have no obligation to renew their subscriptions after
> their subscription period expires, and these subscriptions may not be renewed on the
> same or on more profitable terms.  As a result, our ability to grow depends in part on
> subscription renewals.

29.     The 2016 10-K stated that, as the Company "continue[d] to integrate the GoTo

Business, [it would] determine a renewal rate and calculation methodology that [would be]

appropriate for the combined company[,]" stating in relevant part:

> We derive our revenue primarily from subscription fees for our premium services
> from enterprise customers, SMBs, IT service providers, mobile carriers, customer
> service centers, OEMs and consumers and to a lesser extent, from the delivery of
> professional services primarily related to our Internet of Things business.  The
> majority of customers who subscribe to our services pay in advance, typically with a
> credit card, for their subscription. . . .   Typically, a subscription automatically
> renews at the end of a subscription period unless the customer specifically terminates
> it prior to the end of the period. . . .   Historically, we have calculated our gross
> renewal rate on an annualized dollar basis across all product lines as of the end of
> each period. As we continue to integrate the GoTo Business, we will determine a
> renewal rate and calculation methodology that is appropriate for the combined
> company.

30.     On February 20, 2018, the Company filed its annual report for the fiscal year ended

December 31, 2017 on Form 10-K (the "2017 10-K") with the SEC, which provided the Company's

financial results and position.  The 2017 10-K was signed by Defendant Wagner.  The 2017 10-K

also contained a signed SOX certification by Defendant Wagner attesting to the accuracy of financial

reporting, the disclosure of any material changes to the Company's internal controls over financial

reporting, and the disclosure of all fraud.

31.     The 2017 10-K stated that many of the Company's services are offered through subscription contracts, stating in relevant part:

> The services offered by us are generally sold pursuant to agreements that are one year in duration.  Customers have no obligation to renew their subscriptions after their subscription period expires, and these subscriptions may not be renewed on the same or on more profitable terms.  As a result, our ability to grow depends in part on subscription renewals.

32.     The 2017 10-K stated that the Company would "monitor and assess" its renewal rate calculation as it continued to "integrate the GoTo Business," stating in relevant part:

> We derive our revenue primarily from subscription fees for our premium services from enterprise customers, SMBs, IT service providers, mobile carriers, customer service centers, OEMs and consumers and to a lesser extent, from usage fees from our audio services and the delivery of professional services primarily related to our customer engagement and support business.  Our customers, who subscribe to our services, generally pay in advance and typically pay with a credit card, for their subscription. . . .  Typically, a subscription automatically renews at the end of a subscription period unless the customer specifically terminates it prior to the end of the period. . . .  Historically, we have calculated our gross renewal rate on an annualized dollar basis across all product lines as of the end of each period.  As we continue to integrate the GoTo Business, we will monitor and assess our renewal rate calculation and methodology to ensure that it is appropriate for the combined company.

33.     The statements above were false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results.  Specifically, the Company made false and/or misleading statements and/or failed to disclose that: (i) the Company's business practices had negatively impacted renewal rates for certain of its services; and (ii) as a result, the Company's public statements were materially false and misleading at all relevant times.

## **THE TRUTH EMERGES**

34.     On July 26, 2018, the Company held an earnings' call to report its second quarter

2018 earnings results.  During the call, Defendant Wagner stated that the Company implemented

strategies which negatively impacted renewal rates of certain of its services, including amongst its

GoTo clients:

> **William Raymond Wagner -- *[…] However, tonight, I'd like to begin my comments discussing an area where our performance in the quarter did not meet our expectations, specifically the traditional communications and collaboration business, where our combination of imperfect execution and some hangover effects of last year's merger with the GoTo business led to disappointing renewal rates.***
>
> ***As we move through the quarter, it became increasingly clear that some of the business practices we put in place following the merger were negatively impacting renewal rates. Aggressively moving customers from monthly to annual payments, changing business terms and conditions and barriers we created the auto renewal process all contributed to friction for our customers and made us harder to do business with. In addition, we failed to deliver some planned product enhancements and frankly were slow to address some product quality issues that crept into the product last year as we merged and realigned engineering teams. The impact of these issues was amplified by competitors who took advantage of these execution challenges and successfully target our customer base.***
>
> *    *    *
>
> **Daniel Bergstrom - RBC Capital Markets LLC**: . . . So could you review the efforts around moving the GoTo base from monthly to annual contract? And then, how did that progress over the last year? Is there some measurement or percentage of the user base converted or some way to think about that? And then are we through with that conversion effort at this point?
>
> **Edward K. Herdiech** - Yeah.  ***So, this is Ed. So we are tracking it a couple different ways with respect to renewals in terms of the kind of dollar amount that we were converting. And in Q3, Q4, Q1 and end of Q2 we converted between $10 million and $15 million a quarter and that took the renewal base from, in the 30% kind of annual to in the 50%***. And as you can imagine, we've kind of relaxed our business rules. There's still opportunity to do that. But we're being really flexible. And so we would expect that activity to come down in the second half of the year. At the same time, we are also kind of lapping our efforts to do this.  ***This would be our – the second half of the year would have been our second time through the renewal base, so we were originally planning for that to be lower anyway. And so, there will be some impact, but that's where we're at.***  [Emphasis added.]

35.     On this news, shares of the Company fell $26.60 per share or over 25% to

close at $77.85 per share on July 27, 2018.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

36.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and corporate waste by the Director Defendants.

37.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

38.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and are prepared to do so.

39.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

40.     The Company Board is currently comprised of ten (10) members – Defendants Wagner, Simon, Andrews, Gillis, Henshall, Christenson, Benson, Brennan, Calderoni, and Sacripanti.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, five (5), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

41.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith

effort to prevent or remedy that situation.

42.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

43.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

44.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act

45.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**The Individual Defendants Are Not Independent or Disinterested**

**Defendant Wagner**

46.     Defendant Wagner is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Wagner (as Chief Executive Officer) is an employee of the Company who derives substantially all of his income from his employment with LogMeIn, making

him not independent.   As such, Defendant Wagner cannot independently consider any demand to sue himself for breaching his fiduciary duties to LogMeIn, because that would expose him to liability and threaten his livelihood.

47.     Accordingly, Defendant Wagner lacks independence from Defendants Benson, Calderoni, Christenson, and Henshall, defendants who are not disinterested and who exert influence over defendant Wagner's compensation by virtue of their positions as representing the entire Compensation Committee.

48.     This lack of independence and financial benefits received by Defendant Wagner renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

49.     Defendant Wagner is also a defendant in the securities class action complaint entitled *Wasson v. LogMeIn, Inc., et al.*, 1:18-cv-12330 (D. Mass.) ("Securities Class Action").

**Defendants Brennan, Gillis, Henshall and Sacripanti**

50.     Defendants Brennan, Gillis, Henshall and Sacripanti currently serve as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, reviewing press releases, and assuring the adequacy and effectiveness of disclosure controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter.

51.     Defendants Brennan, Gillis, Henshall and Sacripanti breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business practices and disclosure issues and other deficiencies described above.   Therefore,

Defendants Brennan, Gillis, Henshall and Sacripanti face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Benson, Christenson and Sacripanti**

52.     Defendants Benson, Christenson and Sacripanti currently serve as members of the Nominating & Corporate Governance Committee ("Governance Committee").  Defendants Benson, Christenson and Sacripanti breached their fiduciary duties of due care, loyalty, and good faith, because the Governance Committee, *inter alia*, permitted a business structure and environment supporting the wrongful conduct as alleged herein (and even after repeated reporting of these issues to the Company), allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business practices and disclosure issues and other deficiencies described above.  Therefore, Defendants Benson, Christenson and Sacripanti face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile

<u>**COUNT I**</u>

<u>**(Against The Director Defendants for Breach of Fiduciary Duties)**</u>

53.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

54.     The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

55.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

56.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

57.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## COUNT II

### (Against The Director Defendants for Waste of Corporate Assets)

58.     Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

59.     The Director Defendants knowingly, intentionally, recklessly, or negligently breached their fiduciary duties and, thereby, caused the Company to waste its assets, expend millions of dollars of corporate funds, and impair its reputation and credibility for no legitimate business purpose, as a result of which LogMeIn has been and continues to be substantially damaged.

60.     In light of their deficient performance in supervising controls and financial affairs of the Company, the Director Defendants have wasted corporate assets by overly compensating themselves and the Company's executives during times when the Company was materially misstated its performance to the investing public.

61.     Accordingly, the Director Defendants should be required to make the Company whole for such waste.

**COUNT III**

**(Against the Director Defendants for Violations of Section 10(b)**
**of the Exchange Act and SEC Rule 10b-5)**

62.     Plaintiff incorporates by reference and realleges each and every allegation contained

above, as though fully set forth herein.

63.     During the Relevant Period, Defendants disseminated or approved public statements

that misrepresented or failed to disclose that (i) the Company's business practices had negatively

impacted renewal rates for certain of its services; and (ii) as a result, the Company's public

statements were materially false and misleading at all relevant times.  Thus, the price of the

Company's shares was artificially inflated due to the deception of the Director Defendants.

64.     As such, Defendants caused the Company to violate section 10(b) of the Exchange

Act and SEC Rule 10b-5 in that they:

> (a)     employed devices, schemes, and artifices to defraud; and
>
> (b)     made untrue statements of material facts or omitted to state material facts
> necessary in order to make the statements made, in light of the circumstances under
> which they were made, not misleading.

65.     As a result of Defendants' misconduct, the Company is suffering litigation expense

and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC

Rule 10b-5.

**COUNT IV**

**(Against the Director Defendants**
**for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9)**

66.     Plaintiff incorporates by reference and realleges each and every allegation contained

above, as though fully set forth herein.

67.     SEC Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act,

provides that no proxy statement shall contain "any statement which, at the time and in the light of

the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.  Specifically, the Company's Proxy violated section 14(a) of the Exchange Act and SEC Rule 14a-9 because it included materially false and misleading information and failed to disclose that (i) the Company's business practices had negatively impacted renewal rates for certain of its services; and (ii) as a result, the Company's public statements were materially false and misleading at all relevant times.

68.     In the exercise of reasonable care, the Director Defendants should have known that the statements contained in the Proxy were materially false and misleading.

69.     The misrepresentations and omissions in the Proxy were material to Company stockholders in voting on the matters set forth for stockholder ratification in the Proxy.  The Proxy was an essential link in the accomplishment of the continuation of these defendants' continued violation of their fiduciary duties.

70.     The Company was damaged as a result of these defendants' material misrepresentations and omissions in the Proxy.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Declaring that the Director Defendants have breached their fiduciary duties and participated and/or aided and abetted the breach of their fiduciary duties as alleged herein;

C.     Awarding, against all the Director Defendants and in favor of the Company,

the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

        D.      Declaring that the Director Defendants wasted corporate assets by, among other things, overcompensating themselves at a time when they knew the Company failed to disclose that (i) the Company's business practices had negatively impacted renewal rates for certain of its services; and (ii) as a result, the Company's public statements were materially false and misleading at all relevant times;

        E.      Directing the Director Defendants, jointly and severally, to account for all losses and/or damages sustained by LogMeIn by reason of the acts and omissions complained of herein;

        F.      Requiring the Director Defendants to remit to LogMeIn all of their salaries and other compensation received for the periods when they breached their duties;

        G.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

        H.      Awarding pre-judgment and post-judgment interest as allowed by law;

        I.      Awarding to Plaintiff's the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

        J.      Granting such other and further relief as the Court deems just and proper.

**<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 30, 2019

**SMOOT LAW OFFICE, P.C.**

By: */s/ Steven F. Smoot*_____
    Steven F. Smoot (BBO Number 543799)
P.O. Box 120-245
Boston, MA 02112-0245
Telephone: (617) 345-9600
Facsimile: (617) 507-8383
Email: smoot@smootlaw.com

**GAINEY McKENNA & EGESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, New York 10016
Phone: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-aw.com

***Counsel for Plaintiff***

## **VERIFICATION**

I, KURT SCHLAGEL, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

Kurt Schlagel
KURT SCHLAGEL